SECOND DIVISION

JUNE 30, 1998

1-97-0863

LONNIE JONES,                  )  APPEAL FROM

)  THE CIRCUIT COURT

Plaintiff-Appellant, )  COOK COUNTY.

)

)   No. 94 CH 1254

)

v. ) 

)

THE POLICE BOARD OF THE )  THE HONORABLE

CITY OF CHICAGO, and     )  ARTHUR DUNNE

TERRY G. HILLARD, )  JUDGE PRESIDING.

Superintendent of Police, )

)

Defendants-Appellees. ) 

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff, Lonnie Jones, appeals from a decision of the circuit court affirming the decision of the Police Board (Board) of the City of Chicago and Terry G. Hillard, superintendent of police of the City of Chicago (City), to terminate his employment as a police officer with the City's police force.  On appeal, Jones contends that: (1) the decision of the Board was against the manifest weight of the evidence; (2) his conduct did not warrant discharge; (3) he was prejudiced by an improper grant of a continuance to the City; (4) the improper handling of reluctant witnesses was contrary to law and prejudiced him; and (5) he did not receive a fair and impartial hearing before the Board. 

BACKGROUND

On January 12, 1994, Jones was discharged from his employment with the City of Chicago's police department after the Board found that he violated 10 police department rules during an incident that occurred on June 19, 1992.  At the hearing on the charges Jones testified as follows. In the early morning hours of June 19, 1992, Jones was off duty and wearing civilian clothes.  He had spent an hour and a half in Dell's lounge at 815 East 79th Street.  While at the lounge,Jones became hungry so the owner of the lounge phoned in a food order for Jones at a nearby Harold's Chicken Shack (Harold's).  About 10 minutes later, Jones left Dell's and went to Harold's. Jones testified that he approached the counter. Two men were standing behind the counter.  When he asked the men about his order, the men swore at him and told him to sit down because they were talking.  Jones sat down in the restaurant and waited for 5 or 10 minutes.  Jones testified that when he approached the window a second time, Maurice Fleshman said, "Don't you see me talking.  Get the fuck away from the window.  He will get your fucking chicken when it's ready."  Jones testified that Fleshman then made a fist and pushed him.  The push caused Jones to back into a wall.  Jones asked Fleshman why he had pushed him, pulled out his badge and announced that he was a police officer.  At that point, another man standing by the counter, Derrick Ford, came over to Jones and threatened him.  The three men then began to fight.  Jones testified that the two men were on either side of him and that they were feeling around his back.  He believed they were looking for his weapon.  Jones attempted to push the men away from him and Ford was pushed up against a table.  Fleshman fell near the door.  Jones further testified that Fleshman moved his right hand into his jacket as though he had a weapon so Jones pulled out his weapon, pointed it toward the ground and asked Fleshman to show him his hand.  Fleshman then backed out of the restaurant. Jones went over to Ford, grabbed him and took him outside, where he told him that he was under arrest.  

Once outside, Jones observed Fleshman outside the door by a public telephone.  He told both Ford and Fleshman to line up on the wall and put their hands on the wall.  Jones then flagged down a passing squad car.  Two uniformed police officers, Officer Daria Peterson and Officer Andrea Dawson, arrived on the scene.  The officers yelled at Jones to drop his gun.  Jones told the officers that he was a police officer and showed them his badge. Jones testified that he did not drop the gun because he feared it would go off and hit a citizen.  Eventually he placed the gun in his waistband and tried to tell the officers that he was arresting the two men for battery.   Sergeant Charles Flynn arrived on the scene and ordered Jones to get into the squad car with Officers Peterson and Dawson.  Jones testified that he did not obey the sergeant's order.  Jones was subsequently taken to the station and arrested for battery and aggravated assault.  Several weeks later, Jones reported the incident in writing.

Derrick Ford also testified at the hearing.  On June 19, 1992, Ford was at Harold's with Craig Jackson and Maurice Fleshman.  The three men were sitting at a booth in the restaurant and were eating.  Ford testified that he heard someone come into the restaurant and then heard people arguing.  Jackson kicked Ford under the table and told him to turn around.  When Ford turned around and looked, he saw Jones.  Jones was "nudging" Fleshman by pushing him with his shoulders.  Ford started to get out of the booth and said, "hey."  Ford testified that, at that point, Jones grabbed him by the throat and slammed him onto the table. Ford stated that he knew that his hands were on the table when Jones came over to him because he was holding a piece of chicken.  With one hand around Ford's neck, Jones pulled out his pistol and held it about four inches away from Ford's face.  Then Jones pulled out his badge and told Ford that he was a police officer.  Two other men in the restaurant asked Jones what he was doing.  When Jones turned around to tell them that he was a police officer, he moved his gun away from Ford. Ford then got off the table and walked out of the restaurant.  

Outside the restaurant, Ford saw Maurice Fleshman at a  telephone booth.  Two female police officers arrived on the scene.  Jones came out of the restaurant.  He still had the gun in his hand and was pointing it at the ground.  The female officers identified themselves and told Jones to put down his gun, but Jones pointed at Ford and Fleshman and told the officers to arrest them.  Ford and Fleshman were taken to the police station but they were not charged with anything and were soon released.   On cross-examination, Ford admitted that he had been drinking that night.  

Maurice Fleshman also testified at the hearing.  Fleshman testified that he was standing in line when Jones entered Harold's.  Jones came up to the front of the line and stood next to Fleshman.  Jones was talking to the people who were working behind the counter about his order.  Jones then bumped into Fleshman and told him, "Don't touch me."  Fleshman moved away from Jones.  Jones then pulled out his gun and pointed it at Fleshman.  Fleshman put his hands up and backed out of the restaurant.  Fleshman testified that, at this point, Ford stood up with a piece of chicken in his hand. Jones grabbed Ford and threw him onto the table.  Fleshman then went outside to the pay phone and called 911.  Then Officers Peterson and Dawson arrived.  

Albert Parks, a cook who was working at Harold's on the night of the incident, also testified at the hearing. Parks testified that he did not see what happened after he told Jones that his  chicken was not ready. Parks testified that he only saw when Jones had Ford on the table and had his gun pointed on him.

Earlean Scott testified that she was a cashier at Harold's and was working on the night of the incident.  She also testified that she saw Jones standing over a  man who was lying on a table on his back.  Jones had one hand on the man on the table and another hand on his gun, which he held up in the air. 

Officer Daria Peterson testified at the hearing.  Officer Peterson stated that, as she arrived at the scene at Harold's, she saw a crowd gathering outside the restaurant by the telephone.  Officer Peterson testified that, as they pulled up to the scene, Jones reached into his waistband and pulled out a gun.  The officers yelled at Jones to drop his gun.  Jones told the officers that he wanted the two men who were standing by the telephone arrested.  The officers kept telling Jones to drop his gun but he did not.  Finally, Jones placed the gun in his other hand and told the officers that he was a police officer.  Then Jones showed Officer Peterson his badge, but did not show her his identification card.  Officer Peterson further testified that Jones was "hollering" and was "very loud, physically upset [and] agitated."  Jones kept telling the officers that he wanted Ford and Fleshman arrested.  Officer Peterson then left Jones and walked over to Ford and Fleshman, who were standing near the telephone.  Ford and Fleshman were yelling that they wanted Jones arrested.  

A crowd started to gather so the officers decided to go to the sixth district police station.  Officer Peterson told Jones that they were going to the police station in order to take the incident off the street.  Jones became angrier and stated that he wanted to sign complaints there.  Then Sergeant Charles Flynn arrived on the scene.  Sergeant Flynn spoke with Officers Peterson and Dawson and then spoke with Jones.  Sergeant Flynn also testified at the hearing and stated that he could smell alcohol on Jones' breath.  After speaking with Ford, Fleshman and Jones, Sergeant Flynn decided to take everyone to the police station.  When Jones learned that he was going to the station, he began to call the officers names and curse at them.  He also told them that they did not know their jobs.  At times, Officer Peterson testified, Jones was "in [her] face."  Officer Peterson also testified that she could smell alcohol on Jones' breath.    Sergeant Flynn told Jones that Officers Peterson and Dawson would take him to the police station in their squad car.  Jones responded that he wanted to drive himself to the station and crossed the street to his car.  Sergeant Flynn followed Jones across the street and gave him a direct order to ride to the station in a squad car.  Jones refused to get into a squad car and told the sergeant that he was making a mistake and would regret it.  Jones also said that he had an uncle who was a deputy and that Sergeant Flynn could be in trouble.  At that point, Sergeant Flynn arrested Jones and took him to the police station.  At the station, Jones told Officer Peterson that she would get hers or something to that effect.  He also told her "something pertaining to keeping the punk police" in the sixth district where officers "don't know how to treat police."  

The Board found Jones guilty of violating 10 of the Chicago police department's rules and regulations in connection with the June 19, 1992, incident.  Specifically, the Board found that Jones violated Rule 1, which prohibits a police officer from "violating any law or ordinance"; and Rule 2, which prohibits an officer from taking any action or engaging in conduct that "impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department."  The Board also found Jones violated Rule 2 by disobeying oral orders given by Sergeant Flynn and Officers Peterson and Dawson and by verbally abusing Officers Peterson and Dawson.  Jones was also found guilty of violating Rule 6, which prohibits an officer from disobeying an order or directive, whether written or oral, because, without justification, he threatened to use deadly force against Ford and used nondeadly force against Fleshman in violation of police department general orders.  Furthermore, the Board found Jones guilty of violating Rule 7, which prohibits an officer from committing an act of insubordination or disrespect toward a supervisory officer, on or off duty, by refusing to comply with Sergeant Flynn's orders and by using improper language in Sergeant Flynn's presence.  The Board also found Jones guilty of violating Rule 8, which prohibits an officer from disrespecting or maltreating any person, while on or off duty, and Rule 9, which prohibits an officer from engaging in any unjustified verbal or physical altercation with any person, while on or off duty, by battering Ford and Fleshman, putting his gun to Ford's head, pointing his gun at Fleshman and disobeying and verbally abusing Sergeant Flynn and Officers Peterson and Dawson.  With respect to Rule 14, which prohibits an officer from making a false report, whether written or oral, the Board found Jones guilty because he provided a statement concerning the June 19, 1992, incident that was not true.  The Board also found Jones guilty of violating Rule 15, which prohibits a police officer from becoming intoxicated on or off duty, because he was intoxicated during the June 19, 1992, incident.  The Board further found Jones guilty of violating Rule 37, which prohibits a police officer, whether on or off duty, from not correctly identifying himself, because he failed to identify himself to Officers Peterson and Dawson.  Finally, with respect to Rule 38, which prohibits any unlawful or unnecessary use or display of a weapon, the Board found Jones guilty because he unnecessarily placed a gun to Ford's head, pointed it at Fleshman and displayed it in the presence of Officers Dawson and Peterson.   On January 12, 1994, the Board ordered that Jones be discharged as a police officer.  The Board acknowledged that Jones had presented evidence that he went through alcohol rehabilitation, but rejected his request to mitigate the punishment in the event that he was found guilty of the charges.  On February 8, 1994, Jones filed a petition for administrative review in the circuit court, challenging the Board's decision.  On December 21, 1994, the circuit court entered an order affirming the findings of the Board but reversing the sanction of discharge and remanding the matter to the Board for imposition of a sanction less than discharge if Jones successfully completed a program of alcoholic treatment and a psychological evaluation.

At a hearing on May 19, 1995, Jones' sponsor at Alcoholic Anonymous (AA) testified on behalf of Jones and stated that Jones had been consistently sober since 1993.  Jones also testified that he had been sober and had been attending AA meetings.  On July 6, 1995, the Board issued an order providing that Jones would have until September 30, 1995, to comply with the circuit court's order of December 21, 1994, by presenting documentation of successful completion of an alcoholic evaluation and treatment in a certified program and a psychological evaluation.  

In August 1995, the Board received a letter from the senior program counselor of a 10-day alcoholic treatment program at Columbus Hospital which stated that Jones had completed that program on August 8, 1995.  The Board also received a written psychological evaluation in which clinical psychologists Drs. Eric Ostrov and James Janik of the Center for Applied Psychology and Forensic Studies concluded that Jones was unfit to return to duty as a police officer.  On November 17, 1995, the Board issued its second findings and decision after remand in which it reinstated its previous order of discharge based on Jones' alleged failure to comply with the Board's July 6, 1995, order and the Board's findings that he had violated 10 police department rules.  

Jones appealed the Board's second findings in the circuit court.  Specifically, he asked the court to reverse the order and remand the case to the Board again in order to allow him to cross- examine the psychologists who had authored the evaluation finding him unfit.  On February 6, 1996, the circuit court reversed the Board's November 17, 1995, decision and remanded the case to the Board with directions to conduct a hearing 
de
 
novo
 on the issue of Jones' psychological fitness for duty.  

On September 25, 1996, the Board held a hearing at which the City and Jones called their respective experts to testify.  Dr. James Janik testified for the City and testified that Jones was unfit for duty.  Dr. Jack Arbit testified on behalf of Jones and testified that he believed Jones was able to return to his duties as a police officer as long as he remained sober.  On December 6, 1996, the Board issued its third findings and decision after remand in which it found Jones psychologically unfit for duty based on the testimony and reports of Dr. Janik.  The circuit court affirmed the Board's third findings and decision.  This appeal followed.

We affirm.

ANALYSIS

Initially, we address Jones' motion to strike the supplemental appendix, which was ordered taken with the case.  Jones objects to the City's brief, which includes a transcript of the proceedings in the criminal trial of 
People v. Lonnie Jones
, 92 M1 266846 in its appendix.  Supreme Court Rule 308(c) requires an application for leave to appeal to be accompanied by a copy, certified by the clerk of the trial court, of the order appealed from and of the other parts of the trial court record necessary for the determination of the application.  134 Ill. 2d R. 308(c).  Those documents not certified and attached to the application are therefore not part of the record on appeal and need not be considered.  
Regal Package Liquor, Inc. v. J.R.D., Inc.
, 125 Ill. App. 3d 689, 691, 466 N.E.2d 409 (1984).  This result is not changed by the inclusion of documents in the appendices to the parties' briefs, because attachments to briefs not otherwise before the reviewing court cannot be used to supplement the record.  
Regal
, 125 Ill. App. 3d at 691. See also 
Tomlen Group, Ltd. v. Goldfarb
, 101 Ill. App. 3d 154, 157, 427 N.E.2d 1047 (1981) (Attachments to briefs not otherwise of record are not properly before the reviewing court and cannot be used to supplement the record). Accordingly, we are unable to consider the City's attachment of the transcript to Jones' criminal trial because the transcript is not contained in the record before this court. 
Ahn Brothers, Inc. v. Buttitta
, 143 Ill. App. 3d 688, 690-91, 493 N.E.2d 384 (1986). 

Jones also filed a motion to strike all the footnotes contained in the City's brief.  This motion was also taken with the case.  Jones cites Supreme Court Rule 341(a), which provides that footnotes "if any, shall be used sparingly," and Supreme Court Rule 344(b), which provides that footnotes are "discouraged" in copies of briefs and abstracts filed with the court. (134 Ill. 2d Rs 341(a), 344(b)).  The City's brief is 61 pages and includes 32 footnotes.  However, after reviewing the brief as a whole, we see no reason to strike the City's footnotes.  

Jones contends that the Board's findings are against the manifest weight of the evidence, but first complains that the Board's findings are unreviewable because, in specifying the conduct that constitutes the rule violations, the Board used the words "and/or" to connect the various acts that violated each rule. Jones' argument is unpersuasive.  Such findings are fully capable of review.  There is no statutory requirement for detailed and specific findings of fact by an administrative agency; where the testimony before the agency is preserved for review, specific findings of fact are unnecessary to obtain judicial review.  
Fagiano v. Police Board
, 123 Ill. App. 3d 963, 982-83, 463 N.E.2d 845 (1984).   Accordingly, the Board's findings are reviewable. 

The review of an administrative agency's decision regarding discharge is a two-step process.  
Walsh v. Board of Fire & Police 
Commissioners
, 96 Ill. 2d 101, 105, 449 N.E.2d 115 (1983).  The court must first determine whether the agency̓s finding of guilt is contrary to the manifest weight of the evidence.  Second, it must determine if the findings of fact provide a sufficient basis for the agency's conclusion that there is cause for discharge.  
Walsh
, 96 Ill. 2d at 105.  The record in the instant case demonstrates that the findings of the Board were not against the manifest weight of the evidence.

Ford and Fleshman both testified that Jones pointed his gun at them without any justification and Ford testified that Jones grabbed him by the throat and slammed him onto a table, also without justification.  Parks then testified that he saw Jones pointing his gun at Ford. This testimony sustains findings that Jones violated six department rules, specifically, Rule 1, which prohibits a police officer from "violating any law or ordinance"; Rule 2, which prohibits an officer from taking any action or engaging in conduct that "impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department"; Rule 6, which prohibits violation of police department general orders prohibiting excessive use of force; Rule 8, which prohibits an officer from disrespecting or maltreating any person, while on or off duty; Rule 9, which prohibits an officer from engaging in any unjustified verbal or physical altercation with any person, while on or off duty; and Rule 38, which prohibits any unlawful or unnecessary use or display of a weapon.   Sergeant Flynn and Officers Peterson and Dawson all testified and Jones admitted that he refused to get into the officers' squad car even after being ordered to do so.  This conduct constitutes a violation of Rule 7, which prohibits an officer from committing an act of insubordination or disrespect toward a supervisory officer, on or off duty.  Furthermore, testimony that Jones smelled as if he had been drinking and breathalyzer evidence that established that Jones was intoxicated during the incident supported the Board's finding that he violated Rule 15, which prohibits a police officer from becoming intoxicated on or off duty.  Additionally, we note that Officers Peterson and Dawson both testified that Jones refused to show his identification card when they asked for it.  This conduct violated Rule 37, which prohibits a police officer, whether on or off duty, from not correctly identifying himself.  

After reviewing the record on appeal, we conclude that the Board's findings that Jones violated various police department rules were not against the manifest weight of the evidence.  We believe the evidence, taken in its entirety, is sufficient to find that Jones conduct was violative of the City's rules and regulations regarding the conduct of police officers.

We further conclude that the findings provide sufficient cause for the Board's decision to terminate Jones' employment.  An administrative agency's "determination of cause demands the respect of the court and is only to be overturned if it is arbitrary and unreasonable or unrelated to the requirements of service."  
Swanson v. Board of Police Commissioners
, 197 Ill. App. 3d 592, 606, 555 N.E.2d 35 (1990). "The question is not whether the court would decide upon a more lenient sanction than discharge were it to make the initial determination.  The question is whether the Board acted arbitrarily or unreasonably."  
Swanson
, 197 Ill. App. 3d at 606, citing 
Sutton v. Civil Service Comm'n
, 91 Ill. 2d 404, 411, 438 N.E.2d 147 (1982).  

In our view, the Board's decision to terminate Jones was not arbitrary or unreasonable.  A summary of the findings against Jones shows that, while intoxicated, Jones acted below professional standards in assaulting two people, disrespected fellow officers and a superior officer, and grossly misused his weapon.  Taken as a whole, these findings provide a sufficient basis to terminate Jones' employment.  

Jones argues that the City did not prove that he was psychologically unfit for duty because the City's expert testified that he could not render an opinion on of the day of hearing, September 25, 1996, as to whether Jones was psychologically fit to return to work.  The City contends that Dr. Janik's testimony was properly admitted.

In Illinois, a physician may not testify at trial regarding his opinion of a patient's prognosis unless that prognosis was based on a recent examination. 
Marchese v. Vincelette
, 261 Ill. App. 3d 520, 525, 633 N.E.2d 877 (1994).  In 
Marchese
, the appellate court held that an examination that was taken 15 months prior to trial, although not altogether recent, was properly admitted because the opinion was reached after a course of treatment that extended over a period of years.  
Marchese
, 261 Ill. App. 3d at 525-26. The appellate court quoted the trial court, which had stated, "I believe that it [the expert's testimony] is relevant or there is a sufficient basis for it in the testimony and the observations *** to back up this conclusion."   261 Ill. App. 3d at 526. 

In the case 
sub
 
judice
, the City's expert, Dr. Janik, testified on September 25, 1996, regarding his examination of Jones.  It was Dr. Janik's conclusion, in July 1995, that Jones was unfit for duty.  Dr. Janik testified that the job of a police officer required an individual with a great deal of "balance, reserve and control."  He further stated that he thought it was "a great concern to the department that excessive force and deadly force be used only when absolutely necessary."  However, Dr. Janik concluded that Jones was "an individual with difficulties in the area of control, of angry impulses." Dr. Janik further stated that Jones had coped with his anger by drinking alcohol and that now that he was not drinking, he "continued to be at risk for manifestation of these impulses."  Although Dr. Janik testified at the hearing that he could not offer an opinion as to Jones' fitness at that time, he stated that he stood by his July 1995 opinion.  At the hearing, the following colloquy occurred:

"Q.  In July of 1995, what was your opinion as to whether Officer Jones was to a reasonable degree of psychological certainty fit to return to work?

A.  My opinion at that time was that he was not fit to [
sic
] -- recommended that he not return to work.

Q.  Do you stand by that opinion today?

A.  Yes.  I've reviewed the psychological report and underlying material that Dr. Arbit [Jones' testifying expert examined Jones in March 1996] conducted some six months after and there's nothing in that material that would change my mind at this point."

In our view, the hearing officer properly allowed Dr. Janik's testimony, even though it was based on an examination that took place 14 months earlier.  Dr. Janik's testimony was relevant and his conclusions were supported by other testimony and observations.  Moreover, we note that assessments of witness credibility are within the province of the agency hearing testimony (see 
Collura v. Board of Police Commissioner
, 113 Ill. 2d 361, 373, 498 N.E.2d 1148 (1986)) and the same rules of weight and credibility that are applicable to other witnesses are used to judge the testimony of experts.  
Hall v. National Freight, Inc.
, 264 Ill. App. 3d 412, 423, 636 N.E.2d 791 (1994).  Thus, we cannot say that the Board erred in relying on Dr. Janik's opinion that Jones was psychologically unfit for duty.   Jones also argues that the City acted improperly because it failed to inform Jones of the results and recommendations made by Dr. Janik and because he was never told by Dr. Janik that a short period of counselling would render him fit for duty.  However, Jones misconstrues the record.  Our review of the record indicates that Dr. Janik did not testify that counselling would render Jones fit for duty.  At trial during direct examination, Dr. Janik testified as follows:

"Q.  In order for Jones to resolve some of [his] issues, what would it take on Jones' part?

A.  I would [
sic
] -- psychotherapy probably in the range of three to six, seven months in which he actively participated in self-analysis and analysis of his attitudes."

On cross-examination, Dr. Janik testified as follows:

"Q.  Now, that [
sic
] you may have had certain recommendations regarding he [
sic
] should undergo treatment, psychotherapy, I think you said three to seven months.  If, in fact, he underwent that type of treatment, are you stating that he may be able to go back to the police department, he may be fit for duty or you don't believe he will ever be fit?

A. 
It will depend
 on the variables like his participation, his activity level and his willingness to examine aggressively the aspects of himself, those kinds of things.  If he was successful in the psychotherapy that would certainly 
argue towards [sic
] his returnability
." (Emphasis added.)

The record clearly shows that Dr. Janik did not testify that counseling 
would
 render Jones fit for duty.  Thus, Jones' argument that, had he only been informed of such recommendations, he could have completed any course of therapy and proven his fitness is meritless.  Moreover, Jones ignores the fact that he was not terminated from employment with the police department solely on the basis of his psychological evaluation.  Rather, he was also terminated because he violated several police department rules of conduct. 

Jones further argues that he was prejudiced when the hearing officer granted the City a continuance.  We disagree.  The record establishes that, on the second day of Jones' hearing, counsel for the City advised the hearing officer that two of its witnesses, Maurice Fleshman and Craig Jackson, had not shown up.  The City requested a continuance so that it could seek enforcement of subpoenas directing Fleshman and Jackson to appear at the hearing to testify.  Jones objected to the continuance. Jones now argues that the continuance should not have been granted because no evidence was offered to show that "one of the potential witnesses" had been served with a subpoena. When the hearing resumed, Fleshman testified against Jones. Jones relies on section 10-1-18.1 of the Illinois Municipal Code, which provides that "[n]o continuance may be granted after a hearing has begun unless all parties to the hearing agree thereto."  65 ILCS 5/10-1-18.1 (West 1996).  Jones also relies on Rule III(A) of the Board's rules of procedures, which provides that no continuance shall be granted to any party for the failure of a witness to appear unless that witness had been previously served with a subpoena to appear.  

An administrative agency possesses broad discretion in determining whether to grant a continuance.  
Bickham v. Selcke
, 216 Ill. App. 3d 453, 459, 576 N.E.2d 975 (1991).  Such discretion, however, must be exercised judiciously and not arbitrarily so as to satisfy the ends of justice.  
Bickham
, 216 Ill. App. 3d at 459.  

The record in the instant case indicates that, at the hearing, counsel for the City showed opposing counsel copies of subpoenas for Fleshman and Jackson.  Counsel for Jones contested only the subpoena for Jackson.  The hearing officer then overruled the objection relative to Fleshman and "tentatively" overruled the objection as to Jackson.  The hearing officer allowed Jones to put on the remainder of his witnesses, allowed the City to seek enforcement of its subpoenas and continued the matter for another day at which time the City could call Fleshman and Jackson.  

We cannot say that the hearing officer erred in allowing the continuance.  The record indicates that Fleshman, a key witness to the charges against Jones, was properly served with a subpoena.  The record is unclear as to whether Jackson was properly served.  However, Jackson did not testify.  Accordingly, the continuance was properly granted in the interests of justice to allow enforcement of the subpoena that was properly sought against Fleshman.   

Jones also contends that witnesses were handled improperly. Specifically, Jones points to the reluctance of both Fleshman and Ford to testify before the hearing officer.  The record indicates that, during direct examination, Fleshman stated, "I would just like to go home."  The hearing officer responded that he understood, but that Fleshman had been subpoenaed.  The officer asked Fleshman to please try and answer the questions.  Thereafter, Fleshman continued to answer the questions posed to him on direct, cross-examination and redirect.  During the course of direct examination, Ford asked, "Can I drop this complaint right now?"  The hearing officer explained to Ford that he was only allowed to speak when a question was posed to him.  Ford stated, "I just want to say one thing."  The City objected because there was no question pending.  However, on cross-examination, counsel for Jones asked Ford what he had wanted to say.  Ford responded, " I wouldn't be sitting here right now if he had apologized that night. *** I don't see the point in going on with this."  Thereafter, Ford was excused. 

Jones cites no case law to support his argument that both Fleshman and Ford were "coerced" by the hearing officer and counsel for the City.  We see no error.  Both Fleshman and Ford continued to testify freely even after they expressed a desire to discontinue.  Moreover, Ford explained his reluctance during cross-examination.  We cannot say that Jones was prejudiced by Ford's and Fleshman's hesitancy to testify.

Finally, we reject Jones' contention that he did not have a fair and impartial hearing.  Under the fourteenth amendment (U.S. Const., amend. XIV), the opportunity to be heard should not be arbitrarily limited and fair consideration of an individual's objections should be included.  
Mahonie v. Edgar
, 131 Ill. App. 3d 175, 179, 476 N.E.2d 474 (1985).  We believe Jones was afforded ample opportunity to present and cross-examine witnesses, examine evidence and make arguments on his behalf and that he received a fair and impartial hearing.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McNULTY, P.J., and RAKOWSKI, J., concur.